# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

THE IMMANUEL PRESBYTERIAN CHURCH
OF ALBUQUERQUE, NEW MEXICO,

      Plaintiff,

      vs.                                   No. 1:20-cv-00878-KWR-KRS

CHURCH MUTUAL INSURANCE COMPANY, S.I.,

      Defendant.

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Immanuel Presbyterian Church of Albuquerque, New Mexico ("Plaintiff") and

Defendant Church Mutual Insurance Company, S.I. ("Defendant") disagree about whether

Defendant wrongfully investigated and paid Plaintiff's claim for damages to an insured building

("Church") after a hail and windstorm. Defendant alleges that it paid appropriately under

Plaintiff's insurance policy ("Policy") and accordingly, has filed three motions for summary

judgment on Plaintiff's claims: Defendant's Motion for Partial Summary Judgment on Breach of

Contract (Doc. 52) ("Contract Motion"), Defendant's Motion for Partial Summary Judgment on

Plaintiff's Claim for Punitive Damages ("Punitive Damages Motion") (Doc. 53), and

Defendant's Motion for Partial Summary Judgment on Plaintiff's Insurance Based Claims

("Insurance Claims Motion") (Doc. 54). The Motions are fully briefed.[1] After considering the

---

[1] *See* Plaintiff's Response in Opposition to Defendant's Motion for Partial Summary Judgment on Breach of
Contract (Doc. 58); Defendant's Reply in Support of Motion for Partial Summary Judgment on Breach of Contract
(Doc. 67), Plaintiff's Response to Defendant's Motion for Partial Summary Judgment on Plaintiff's Claim for
Punitive Damages (Doc. 59), Defendant's Reply in Support of Motion for Partial Summary Judgment on Plaintiff's
Claim for Punitive Damages (Doc. 65), Plaintiff's Response in Opposition to Defendant's Motion for Partial
Summary Judgment on Plaintiff's Insurance Based Claims (Doc. 60), Defendant's Reply in Support of Motion for
Partial Summary Judgment on Plaintiff's Insurance Based Claims (Doc. 63).

parties' briefing, the records of the case, and the applicable law, the Court will deny the motions.

## I.   Legal Standard

"[I]n a federal diversity action, the district court applies state substantive law—those rights and remedies that bear upon the outcome of the suit—and federal procedural law—the processes or modes for enforcing those substantive rights and remedies." *Los Lobos Renewable Power, LLC v. Americulture, Inc.*, 885 F.3d 659, 668 (10th Cir. 2018). This means that when considering a summary judgment motion a federal judge "will look to [state law] to determine what elements the plaintiffs must prove at trial to prevail on their claims" but "exclusively to federal law to determine whether plaintiffs have provided enough evidence on each of those elements to withstand summary judgment." *Milne v. USA Cycling Inc.*, 575 F.3d 1120, 1129 (10th Cir. 2009) (internal citations omitted). The Complaint alleges breach of an insurance contract and violations under New Mexico laws governing insurance contracts, so New Mexico law applies.

A court may grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995) (quotation omitted). When applying this standard, the Court examines the factual record and reasonable inferences in the light most favorable to the party opposing summary judgment. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). "Once the moving party has met its burden, the burden shifts back to the nonmoving party to show that there is a

genuine issue of material fact." *Jensen v. Kimble*, 1 F.3d 1073, 1077 (10th Cir. 1993) (citing *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991)). Disputes are genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and they are material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (further citation and internal quotation marks omitted).

## II. Procedural History and Facts

### A. Complaint

On July 17, 2020, Plaintiff brought a Complaint against Defendant for Breach of Contract, Bad Faith Insurance Conduct, and Violations of New Mexico Unfair Insurance Practices Act ("Complaint") in the Second Judicial District of Bernalillo County, New Mexico. On August 28, 2020, Defendant removed the case to federal court based on diversity under 28 U.S.C. § 1332(a). Doc. 1.

The Complaint alleges that Defendant failed to properly compensate Plaintiff under its Policy for damages to the exterior and interior of the Church after a hail and windstorm on July 30, 2018. The Complaint asserts claims for (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, and (3) violations of the New Mexico Unfair Insurance Practices Act ("UIPA"). Plaintiff asks for compensatory damages, consequential damages, incidental damages, punitive damages, court costs, attorney fees, and statutory penalties and interests.  Defendant's motions seek partial summary judgment on all claims and on Plaintiff's request for punitive damages.

### B. Undisputed Facts

Facts set forth in Defendant's Motions that are not specifically controverted by Plaintiff are deemed undisputed. *See* D. N.M. LR-CIV 56.1(b). The following facts are undisputed, or where disputed, are presented in the light most favorable to Plaintiff.

Plaintiff owns and operates a Church located at 114 Carlisle Blvd. SE, Albuquerque, N.M. Plaintiff has been operating the Church since the mid 1950's, and the Church is on the registry of historic buildings.

Defendant is an insurance company who insured the Church under Policy No. 0144088-02-934135, with a policy period of 10/01/2016 to 10/01/2019. Doc. 58 at 5. The Policy had a deductible of $1,000.00 with a policy limit of $5,006,263.00. *See* Doc. 58-11 at 1. Plaintiff is the owner of the Policy and the named insured. At the time of the event that resulted in this Complaint, Defendant had insured the Church for many years. *See* Doc. 58 at 5. The parties agree that the Policy is a valid, binding, and enforceable contract between the parties. *Id.*

At the time of the hail and windstorm, the roof of the Church, which was approximately ten years old, was a coated sprayed polyurethane foam ("SPF") roofing system installed directly over a previously installed built up system with gravel aggregate. Doc. 58 at 5.

Plaintiff regularly inspected the roof and conducted maintenance and minor repairs. *Id.* at 6.

On July 30, 2018, a hail and windstorm swept through Albuquerque. *See* Complaint, Doc. 1-1 at 5.

After the storm, water leaked through the roof of the church, requiring buckets and tarps to catch voluminous interior leaking in multiple areas. Doc. 58 at 5.

The Policy covered physical losses to the exterior of the building resulting from hail and/or windstorm events. Doc. 52 at 3-4. The policy excluded interior damages unless the

interior damages occurred because of a "Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters." Doc. 52 at 4.

Within a week of the storm, Plaintiff made claim (No. 1357962) to Defendant under the Policy for damages to the exterior and interior of the Church. ("Claim"). *See* Doc. 58-11, Doc. 58-13 at 26:3-6 (testimony of William D. Prather stating that Plaintiff made an oral claim the next day and a written claim within the week).[2]

Initially, the claim was assigned to a third-party claims adjustor ICA, Inc. with reserves set at $150,000.00. *See* Doc. 58-11 at 1 (claim), Doc. 58-14 at 3,18:13-25 (reserves).

For Defendant, Jim Koontz did the initial roof inspection. *See* Doc. 58-20 at 2. After that inspection, Defendant determined that hail during the July 30, 2018 storm had damaged the Church's SPF roof, but that the interior damage to the Church was unrelated to the storm. *Id.* ICA determined that the roof could be repaired by removing the damaged SPF and respraying new SPF. Doc. 58-11.

On October 25, 2018, Defendant sent a letter to Plaintiff estimating the cost for repair at $136,870.15 and offered a settlement of $85,905.06. The latter amount was derived by subtracting recoverable depreciation and the Plaintiff's $1,000 deductible from the total sum. Doc. 58-18 at 1. The letter denied coverage for any interior water damage, stating that any interior damage was "the direct result of wear, tear and deterioration, continuous or repeated seepage of water, maintenance and wind driven rain without a storm created opening, which is specifically excluded under your policy."  *Id.* at 2.

---

[2] A document from Church Mutual asserts that a claim was made on "June 30, 2018." As the storm occurred on July 30, 2018, the Court will assume that this is a typo. *See* Doc. 58-12 at 1. Regardless, the parties do not disagree that a claim was made quickly after the alleged loss.

Subsequently, on January 25, 2019, Defendant appointed Ned Derickson the claims adjuster. At that time, he was a contract employee with Defendant. *See* Doc. 58-14 at 5, 25:4-9.

At some time after the initial offer from Defendant, Plaintiff retained a licensed public adjusting firm, C3 Group, Inc. ("C3") to assist it with the claim and to work with Defendant toward a resolution. *See* Doc. 58-13 at 4, 22:10-17.

Approximately fifteen months later, in October 2019, Defendant replaced Ned Derickson with John Kubant, a senior claims supervisor employed by Defendant. Doc. 58-4 at 2 16:23-35, 17:1-8. That same month Mr. Kubant inspected the Church with representatives from Nelson Engineering ("Nelson"). *Id.* at 4, 25-28.

On November 15, 2019, Defendant sent a letter to C3 with a new estimate of the cost to repair the damaged roof.  The new estimate stated that the replacement cost value of the roof was $496,749.33 minus a depreciation value of $175,708.00 and a deductible of $1,000, yielding a total payment to Defendant of $234,000. Doc. 58-19 at 1.

On November 26, 2019, Nelson issued a report to Defendant. The report found that the damage to the roof was more extensive than previously. The report did not change the previous determination that the wind and hailstorm did not cause the interior damages.

On May 15, 2020, Defendant sent a letter to Plaintiff. This letter indicates that after review, Defendant revised its estimate of the replacement value of loss to $658,154.43. Doc. 58-12 at 1.

At some time thereafter, Defendant again revised its estimate and prepared a final statement of loss in the amount of $733,057.24. Doc. 58-4 at 8, 62:22-25, 63:1-3.

Defendant repeatedly denied coverage for interior damage in letters dated October 25, 2018 (Doc. 58-18), January 23, 2020 (Doc. 58-20), March 31, 2020 (Doc. 58-21) and May 8, 2020 (Doc. 58-22).

## III. Discussion

### A. Defendant's Contract Motion

Defendant's Contract Motion asks the Court for partial summary judgment on Plaintiff's breach of contract claim alleging that Defendant wrongfully denied payment for interior water damage to the Church.[3] A policy of insurance is a contract and is "construed by the same principles governing the interpretation of all contracts." *Crow v. Capitol Bankers Life Ins. Co.*, 891 P.2d 1206, 1210 (N.M. 1995) (citing *Vargas v. Pac. Nat. Life Assur. Co.*, 441 P.2d 50, 53 (1968)). Under New Mexico law, "[t]he elements of a breach-of-contract action are the existence of a contract, breach of the contract, causation, and damages." *Abreu v. New Mexico Child., Youth & Fams. Dep't*, 797 F.Supp.2d 1199, 1247 (D.N.M. 2011) (further citation omitted).

The parties agree that the Policy covers exterior damages to the Church and that the damage to the exterior of the Church was a covered loss. They concur that any interior damages that directly result from a covered loss are also covered by the Policy. But Defendant "denies that any of the damage to the interior of the church resulted from a covered loss." Doc. 52 at 1. Defendant asserts that the interior damages occurred because of preexisting damage to the roof that during the storm permitted water intrusion. Defendant further contends that Plaintiff's expert, Mr. Greg Becker, agrees with its position.

---

[3] In its response, Plaintiff addresses Defendant's statement in his Motion that "[Defendant] denies that it is liable or any additional money for repairs to the roof." Doc 52 at 1. But Defendant's Contract Motion asks only for partial summary judgment on Plaintiff's interior damage claims, so, the Court will not further consider any arguments regarding Plaintiff's exterior damage claims.

Isolating portions of Mr. Becker's deposition, Defendant argues "[a]ccording to Mr. Becker, the primary causes of the roof leaking are the parapet leaks and leaks caused by the swamp cooler separations." *Id.* at 4 (quoting Becker Dep., Doc. 52-2 at 6, 43-45). Defendant further asserts that "Plaintiff's expert provides no testimony that the hail penetration to the roof caused the interior leaking and in fact agrees with Church Mutual that the interior water intrusion arose from wind being driven through defects in the parapets and the separations at the swamp coolers." *Id.* at 6.  Finally, Defendant discounts Mr. Becker's March 29, 2022, declaration that the water intrusion occurred because of the storm, stating that the declaration is untimely as it was created "more than fourteen months after his Storm Damage Assessment [January 25, 2021 report], nearly two months after his deposition, and one month after the dispositive motion deadline." Doc. 67 at 3-4.

 Plaintiff contends that Defendant's summary of Mr. Becker's opinion ignores a significant part of Becker's testimony and report. While Plaintiff concurs with Defendant that Mr. Becker testified that some of the interior water damage to the Property may have resulted from wear and tear or preexisting leaks, Plaintiff asserts that Mr. Becker has consistently opined that the storm caused at least some of the separations and that those separations resulted, in turn, in the leaks that caused interior damage to the Property. Doc. 58 at 11-13. The evidence supports Plaintiff's statements.

In his January 25, 2021 report Mr. Becker attributes the interior water damage to wind that occurred during the July 30, 2018 storm. Doc. 58-3 at 10.  Confining his findings to the damages caused by this storm, Mr. Becker states:

> The interior leak locations were confirmed as occurring after the storm with informed personnel. These were traced to vulnerable roof surface in various locations throughout the roof above. The roof is a lower slope which allows runoff water to penetrate new openings during rain events and migrate beneath the

foam to areas away from the intrusion points. ***The openings are at vulnerable areas and foam surface impacts most likely caused by the identified storm***.[4]

*Id.* (emphasis added). While it is correct that Mr. Becker expressed this opinion more strongly in his March 29, 2022, declaration, that declaration does not assert new opinions but references Mr. Becker's first report. Doc. 58-3 at ¶ 6 ("The [attached] report constitutes my opinions in this matter and relate to the causation of the damages and proper repair method as a result of that damage to the Immanuel Presbyterian Church").

Nor does Mr. Becker's deposition contradict his report. A year after Mr. Becker completed his report, in his January 24, 2022, deposition, Mr. Becker testified that certain areas, such as parapets or areas with an installed cooling system, are uniquely vulnerable to wind. High winds, he stated, like those that occurred at the time of the storm, may cause separations in the junctions between the parapets and the roof, and between the cooling systems and the roof. Water may then enter through those separations:

> The flashing being what keeps the water out of that roof penetration, separated and that's what led to all that water coming through. So there is a problem with that area, but it was exacerbated and caused that flood of a leak because of wind.

Doc. 58-2 at 6, 38:11-15. In his sworn testimony, Mr. Becker further stated that additional water that collected on the roof because of the storm, may have migrated through areas damaged by hail to the interior of the church:

> Q:  What's your opinion as to whether hail damage to the SPF caused the water intrusion following the 2018 storm.
>
> A:  Well, in general, the water intrusion that I saw there were caused at the parapet levels and the roof penetration that we have previously discussed, but after looking at some of the additional photographs that showed water and the

---

[4] Mr. Becker's January 25, 2021, report further explained: "Based on the onsite findings, the proximity of the nearest observation of strong thunderstorm winds, and the accounting from the building owner, the damage was caused by the 7-3-2018 thunderstorm damaging winds (observed up to 52 kts or 59.8 mph). Other lessor and/or less predominant storm events were ruled out (see attached applicable data). Doc. 58-3 at 10.

water accumulated on the SPF roof, I wouldn't be able to rule that out as contributing if it migrated to the edges because you have got – once water gets through any thin layers of your SPF, you have got a pathway for it to migrate to where it can go down at the perimeter or any roof penetration, and that pathway is along what used to be the tar-and-gravel area or at the tar-and-gravel area because there is never a perfect seal there. That leaves air space between the SPF and the tar-and-gravel roof. So that's a perfect migratory pathway. So I couldn't rule that out, at least on the east and west side areas.

Q:  Okay.

A:  That's why I separate damage from water migration, but the SPF roof was damaged, not doubt.

Q:  Right. The question is, did it cause the migration of water that then resulted in leaks within the Church, right. That's the question?

A:  As I previously said, yes. That's different.

*Id.* at 7, 43:21-25; 44:1-22.

While Defendant correctly observes that Mr. Becker agrees that not all leaks were the result of the storm, at no time did Mr. Becker posit that no leaks were the result of the storm.[5]  In sum, the evidence shows that the source of the water intrusion has been an ongoing factual disagreement between the parties.[6] Whether the hail and windstorm caused the leaks that led to the interior damage is a material, disputed factual issue, and the Court will deny Defendant's Contract Motion.

---

[5] Interestingly, in its attendant Insurance Summary Judgment Motion, Defendant acknowledges that Mr. Becker only attributed *some leaks* to previous wear and tear. *See* Insurance Practices Motion, Doc. 54 at 7 ("Even Plaintiff's own expert believes that ***some interior water damage*** was caused by leaks and other wear and tear over time" (emphasis added)). This statement appears to contradict Defendant's assertion in this motion that Mr. Becker attributed ***all leaks*** to wear and tear.

[6] Notably, after the event, both Plaintiff and Defendant hired professionals to evaluate the damage to the Church. On November 26, 2019, Nelson Forensics completed a report for Defendant that found that the water intrusion into the interior was related to "installation deficiencies." Doc. 53-3 at 4. Nelson Forensic concluded "that the [hail damage] has not caused any of the interior moisture distress within the interior of the church." *Id.* On April 6, 2020, CES Engineering remitted a report to Plaintiff that concluded that the SPF roof was uneven and while there were areas that were extremely thick, there were also areas where the foam was much thinner and so could have resulted in water penetration that then migrated to the interior of the Property. Doc. 58-9 at 3. The report states: "CES is quite certain the damage caused by the hailstorm is directly related to the water intrusion into the interior damage and should be included in any plans for remediation of the Church." *Id.*

**B. Defendant's Insurance Practices Motion**

Plaintiff alleges that Defendant violated both the implied covenant of good faith and fair dealing and the UIPA. In the Insurance Practices motion, Defendant asks for summary judgment on both claims, arguing that the evidence shows that it had a "reasonable basis for the partial denial of Plaintiff's claim and did not otherwise engage in any unreasonable or fraudulent conduct." Doc. 54 at 6.

### *1. Implied Covenant of Good Faith and Fair Dealing*

In New Mexico, "[w]hether express or not, every contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement. Broadly stated, the covenant requires that neither party do anything which will deprive the other of the benefits of the agreement." *Salas v. Mountain States Mut. Cas. Co.*, 202 P.3d 801, 805 (N.M. 2009) (further citation and quotation omitted). The purpose of the implied covenant is to make "effective the agreement's promises." *Azar v. Prudential Ins. Co. of Am.*, 68 P.3d 909, 925 (N.M. 2003). The duty arises when there is an existing underlying contract, but notably, it cannot override the express terms of an integrated written contract. *Melnick v. State Farm Mut. Auto. Ins. Co.*, 749 P.2d 1105, 1109-10 (N.M. 1988). "The key principle underlying the covenant of good faith in an insurance contract is that the insurer treat the interests of the insured equally to its own interests." *City of Hobbs v. Hartford Fire Ins. Co.*, 162 F.3d 576, 582 (10th Cir. 1998). A party will breach that duty when through bad faith or wrongful intentional conduct the "party seeks to prevent the contract's performance or to withhold its benefits from the other party." *Id.* To establish a claim for bad faith, Plaintiff must show one of the following: (1) Defendant did not deal fairly with Plaintiff; (2) Defendant's reasons for refusing to pay were frivolous or unfounded, (3) Defendant did not act reasonably under the circumstances to conduct a fair evaluation of coverage; or (4)

Defendant failed to act honestly and in good faith in the performance of an insurance contract. *Progressive Cas. Ins. Co. v. Vigil*, 413 P.3d 850, 857 (N.M. 2018) (citing *O'Neel v. USAA Ins. Co.*, 41 P.3d 356, 360 (N.M. Ct. App. 2002)); *see also* UJI 13-702 (jury instructions listing the required elements for bad faith). Plaintiff's common law bad faith claim seeks relief on all four bases.

Defendant asserts that Plaintiff has not provided evidentiary support for its bad faith claim, because "[Defendant] had a reasonable basis for the partial denial of Plaintiff's claims and did not otherwise engage in any unreasonable or fraudulent conduct." Doc. 54 at 6. Defendant declares that it "promptly addressed Plaintiff's claims and began its investigation." *Id.* at 7. Defendant further contends that any delay in settling the exterior damage claim was legally inconsequential unless Plaintiff can show that the reason for the delay was "frivolous or unfounded" or that Defendant's handling of the claim "utterly and totally lacked foundation, was arbitrary or baseless, or lacked even arguable support in the policy." Doc. 63 at 3.

At the initiation of a claim, insurers are required to promptly investigate and process an insured's claim for coverage. "'In this context, insurer conduct is measured by basic standards of competency and the insurer is charged with knowledge of the duty owed to its insured.'" *OR&L Constr., L.P. v. Mountain States Mut. Cas. Co.*, 514 P.3d 40, 51 (N.M. 2022) (quoting *Sherrill v. Farmers Ins. Exch.,* 374 P.3d 723, 734 (N.M. Ct. App. 2016)). When analyzing the sufficiency of an investigation, a court should focus on whether a defendant conducted a reasonable and adequate investigation. *Sloan v. State Farm Mut. Auto. Ins. Co.*, 85 P.3d 230, 237 (N.M. 2004) (citing *Ambassador Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 690 P.2d 1022, 1025 (N.M. 1984)). Plaintiff alleges that Defendant's investigation was unreasonable because at the onset of

the claim, Defendant should have or could have discovered the true scope of the exterior damages. There is evidence that supports this argument.

During the eighteen-month period between the filing of the claim and the repair of the roof, Defendant's valuation of the exterior damages underwent several revisions. Initially, on October 25, 2018, Defendant offered Plaintiff $136,870.15 to repair the roof with a new coat of SPF. Over a year later, after Plaintiff hired public adjustor C-3, and after C-3 requested a second inspection of the roof, on October 29, 2019, Defendant's representative, Nelson, conducted a second inspection. The second inspection found that there was greater damage to the roof then originally determined. *See* Doc. 58-20 at 2.  In a letter dated January 23, 2020, Defendant quotes from the second inspection which found, "[t]he drainage for the subject roof is poor, creating a potential life safety hazard due to the potential for roof collapse caused by excessive water accumulation on the roof." *Id.*  Subsequently, Defendant offered Plaintiff an increased sum of $496,749.33 to resolve the claim. Doc. 58-19. By May 2020, Defendant agreed to pay $732,057.24, for replacement of the entire roof as well as some additional exterior damage. The long delay in resolving the claim, the shifting assessment of the scope of the work, the developing hazardous condition of the roof, and the 538 percent increase from the original settlement amount could support an inference that Defendant's settlement offers were not based on adequate information.

Defendant declares that Plaintiff's argument about the sufficiency of the investigation relies on "later-produced evidence, not evidence before [Defendant] or its claim administrator at the time" so "[Defendant] could not have made a 'knowing misrepresentation' in 2018 based on evidence created in 2020." Doc. 63 at 4. Plaintiff disagrees, arguing both that (1) Defendant did make a knowing misrepresentation and (2) that Defendant did not conduct a sufficient

investigation. With respect to its first argument, Plaintiff observes that Defendant's first quote of the cost to repair the exterior damages was a "knowing misrepresentation" because re-foaming the roof with SPF would not have been in accordance with building codes. Doc. 60 at 11. Second, Plaintiff contends that even if Defendant could show that it did not make a "knowing misrepresentation," there would still be a material factual question about whether Defendant dealt fairly with Plaintiff in how it conducted the investigation.

An insurer's obligation to deal fairly with an insured means that an insurer must conduct an investigation with due care for the interests of the insured. "More specifically, this means that an 'insurer cannot be partial to its own interests but must give its interests and the interests of its insured equal consideration.'" *Dairyland Ins. Co. v. Herman*, 954 P.2d 56, 61 (N.M. 1997) (quoting *Lujan v. Gonzales,* 501 P.2d 673, 680 (N.M. Ct. App. 1972)). Defendant's argument that it did not ***know*** the extent of the damage relies on an assumption that an insurer with a mistaken belief cannot be liable for bad faith. There is no doubt that what an insurer knows is relevant to the question of an insurer's intent. But a lack of knowledge does not absolved a Defendant of its duty to deal fairly with an insured by conducting an adequate investigation into a claim. Whether Defendant's investigation was adequate, is a material factual issue on which the parties disagree.

Next, Defendant argues that Plaintiff has not supported its allegations that Defendant wrongfully denied the interior damage claim. Defendant argues that "[f]or the purpose of its bad faith claim, Plaintiff's burden is not to convince the Court that investigative evidence supports its position—Plaintiff must show that ***no investigation or evidence supports [Defendant's]***" and "[t]his Plaintiff fails to do." Doc. 63 at 5 (emphasis added). The Court is puzzled by this statement. Defendant offers no legal support--and the Court can find none—that provides authority for this proposition.

To be sure, to substantiate its allegation that Defendant wrongfully denied the interior damage claim, Plaintiff must show that Defendant's refusal to pay was frivolous and unfounded. But a frivolous and unfounded refusal to pay is not one that is knowing, or necessarily "'erroneous' or 'incorrect,' but rather the failure to exercise care for the interests of the insured, an arbitrary or baseless refusal to pay, lacking support in the language of the policy or the circumstances of the claim." *Sloan,* 85 P.3d at 237 (N.M. 2004) (quoting *Jackson Nat. Life Ins. Co. v. Receconi*, 827 P.2d 118, 134 (1992)). Plaintiff has furnished evidence that supports its allegation that Defendant's denial of the claim may have been both incorrect and made in a manner that did not consider Plaintiff's interests.

All three of Plaintiff's submitted reports find that at least some of the interior damage was caused by the hailstorm.[7] Each report derives its conclusions from several sources, including the expertise of the reviewer, inspections of photos, inspections of the roof, infrared studies, and samples of the roofing material. Also discussed in the reports are witness statements about the Church's physical condition both before and after the hail and windstorm. Plaintiff also presents sworn testimony from these witnesses that after the storm, the Church interior began leaking in a manner it never had before, with one witness stating that the water "was coming in by the bucketful already just the next day after the hailstorm.[8] Doc. 58-13 at 5, 27:12-13 (testimony of Elder, William D. Prather). Finally, Plaintiff's evidence includes testimony from Defendant's

---

[7] *See* April 4, 2020 Limited Roof Damage Assessment by Childress Engineering, Doc. 58-9 ("CES is quite certain the damage caused by the hailstorm is directly related to the water intrusion into the interior damage and should be included in any plans for remediation of the Church"); January 25, 2021 Storm Damage Assessment Completed by Greg T. Becker (Doc. 58-3) ("the wind and hail storm resulted in damage to the exterior and interior of the Church"); March 8, 2021 Cost Estimate completed by David Poynor (after conducting an inspection and isolating only those damages that resulted from the storm, determining that there were both interior and exterior damages and preparing a cost estimate for both).

[8] Defendant's claims adjustor, Mr. Kubant, testified that he knew that church witnesses had stated that after the storm the roof stated that "some" of the "interior water had not been there previously." Doc. 58-4 at 4-5, 28:16-20, 29:11-17. But neither Defendant nor its experts refer to any witness testimony in the expert reports or claim denial correspondence nor do they explain their reasons for discounting it.

claims adjuster, Mr. Kubant, that Defendant never examined any underwriting information about the Church's physical condition that it may have collected prior to issuing the Policy. *See* Doc. 58-4 at 9 76:3-22.

To demonstrate that Plaintiff has raised no material issues of fact, Defendant must do more than show that it had a reason for denying the interior damage claim. Indeed, if all that is required to rebut a bad faith claim is that a defendant had *some reason* for its denial, then a plaintiff could never prevail on this issue. Defendant does not suggest or provide any evidence that Plaintiff's reports about the cause of the interior damage are wrong or misguided. Instead, Defendant proposes that the evidence in total demonstrates nothing more than differing opinions. Defendant's acknowledgment that the parties have different opinions about a material factual issue is not dispositive of whether Defendant's decisions were reasonably informed or whether Defendant recklessly denied Plaintiff's claim. But Defendant's recognition that there are differing opinions does negate Defendant's argument that there are no material factual issues in dispute.

Plaintiff also objects to Defendant's refusal to pay its entire invoiced cost of $1,100,950.68 to repair the roof, arguing that in doing so, Defendant acted in bad faith. This issue involves a dispute about an interpretation of the word "necessary" in the Policy. Section 7(4) of the Policy discusses compensation for covered losses and states:

> We will not pay more for loss or damage on a Replacement Cost basis than the least of:
> (a) The Limit of Insurance applicable to the lost or damage property;
> (b) the cost to replace "on the same premises" the lost or damaged property with other property;
>   1) Of comparable material and quality; and
>   2) Used for the same purpose; or
> (c) The amount *you actually spend that is necessary* to repair or replace the lost or damaged property.

Doc. 58-10 at 2 (emphasis added). Defendant interprets the word "necessary" to mean a sum within "customary profits in the industry." Doc. 63 at 6. Defendant explains that it declined to

pay the full amount of Plaintiff's invoice because of a line item for a 35 percent profit in the amount of $362,028.37, a sum Defendant contends is unreasonable. *Id.*

In response, Plaintiff states that the relevant Policy provision requires Defendant to pay its cost to "repair or replace the lost or damaged property." Plaintiff argues that the invoice it gave to Defendant was the necessary amount. Plaintiff also presents an expert report by Mr. David Poynor that states that a "true and fair estimate" of the cost to repair the exterior damage is $1,068,276.69. *See* Doc. 58-7 at 7. The resolution of this question depends on resolving the factual issue of whether a 35 percent profit charge is necessary or reasonable amount, and if, in determining that it was not, Defendant acted in bad faith. This is a question for a jury.

### 2. UIPA Claims

Defendant also seeks summary judgment on Plaintiff's UIPA claims. The UIPA prohibits unfair, deceptive or fraudulent practices. *See* N.M. Stat. Ann. § 59A-16-3 (1978). The UIPA defines fifteen practices as unfair and deceptive when they are "knowingly committed or performed with such frequency as to indicate a general business practice." *See* N.M. Stat. Ann. § 59A-16-20 (1978). Without specifically citing to the relevant sections of the statute in the Complaint, Plaintiff makes claims that roughly fall into three categories: Defendant failed to properly investigate Plaintiff's claims, Defendant failed to properly settle Plaintiff's claims, and Defendant made misrepresentations about the scope of coverage.

Defendant's arguments regarding Plaintiff's UIPA claims parallel its arguments regarding Plaintiff's common law bad faith claims. Without further developing these arguments, Defendant suggests that because these claims "mirror the bad faith claims, [Defendant] is entitled to summary judgment as a matter of law on Plaintiff's UIPA claim as well."[9] Doc. 54 at 8. As the

---

[9] In its Reply, Defendant asks for summary judgment on Plaintiff's UIPA claim that Defendant failed to timely provide Plaintiff with information upon request, and "failed to affirm or deny coverage after proof of loss was

Court has found that there are disputed factual issues on Plaintiff's bad faith claims, the Court

will also deny Defendant's motion for summary judgment on Plaintiff's UIPA claims.

### C.  Defendant's Punitive Damages Motion

Defendant's Punitive Damage Motion asks for partial summary judgment on Plaintiff's

request for punitive damages. Once a plaintiff demonstrates an entitlement to compensatory

damages, he may then show an entitlement to punitive damages.  *Jessen v. Nat'l Excess Ins. Co*,

776 P.2d 1244, 1247 (N.M. 1989) (citing *United Nuclear Corp. v. Allendale Mut. Ins. Co.*, 709

P.2d 649, 654 (1985)). "[P]unitive damages may only be awarded when the insurer's conduct

was in reckless disregard for the interests of the plaintiff, or was based on a dishonest judgment,

or was otherwise malicious, willful, or wanton." *Sloan*, 85 P.3d at 232. In New Mexico,

> a punitive-damages instruction should be given to the jury in every common-law
> insurance-bad-faith case where the evidence supports a finding either (1) in
> failure-to-pay cases (those arising from a breach of the insurer's duty to timely
> investigate, evaluate, or pay an insured's claim in good faith), that the insurer
> failed or refused to pay a claim for reasons that were frivolous or unfounded, or
> (2) in failure-to-settle cases (those arising from a breach of the insurer's duty to
> settle a third-party claim against the insured in good faith), that the insurer's
> failure or refusal to settle was based on a dishonest or unfair balancing of
> interests.

*Id*. Plaintiff asks for punitive damages on both its common law bad faith and its breach of the

covenant of good faith and fair dealing claims.

Referencing New Mexico caselaw and Uniform Jury Instruction ("UJI") 13-1827,

Defendant argues that as a matter of law, the punitive damage claim fails to allege the necessary

elements for this remedy.  Doc. 53 at 9. Defendant argues that a party seeking punitive damage

---

submitted and that [Defendant] failed to timely explain why it denied Plaintiff's claim under subsections (D) and
(N). *See* Doc. 63 at 9 (citing Compl. ¶ 31(d), (h)). These arguments are not included in Defendant's Motion, so
Plaintiff did not have an opportunity to respond to them. As they are improperly raised for the first time in a Reply
brief, the Court will not consider them further here.

against a company, or a corporate entity must show corporate or vicarious liability by establishing that (1) that the opposing party or its agent or employee maliciously, willfully, recklessly or wantonly engaged in wrongful conduct; or (2) that the company authorized, participated, or ratified the conduct of that agent or employee; or (3) that the behavior of the agents or employees of a company cumulatively establish its culpability. Doc. 53 at 5 (citing *Chavarria v. Fleetwood Retail Corp.*, 143 P.3d 717 (N.M. 2006); NMRA Rule 13-1827. Because Plaintiff has not shown the requisite link between Defendant and its agents or employees, Defendant asks the Court to grant summary judgment.

Plaintiff responds that UJI 13-1827 does not apply to punitive damage claims against insurance companies because a separate jury instruction, UJI 13-1718, sets a different applicable standard. By its terms, UJI-13-1718 applies specifically to insurance companies who are accused of bad faith. The language of UJI 13-1718 differs from UJI 13-1827 in that it does not demand that a plaintiff show that a company has vicarious liability for the actions of its agents or employees. In fact, the language of UJI 13-1718 does not separate the actions of an employee or agent from actions of the insurance company. Rather a plaintiff may establish liability if a jury "find[s] that the conduct of the insurance company was in reckless disregard for the interests of the plaintiff, or was based on a dishonest judgment, or was otherwise malicious, willful or wanton. . .." NM. R. Civ. UJI 13-1718.

Significantly, the "Use Notes" for UJI 13-1718 indicate that it is the appropriate instruction for a claim against an insurance company for bad faith failure to pay a first party claim, which is the claim made here. The notes also state "[b]ecause this instruction is complete on the availability of punitive damages in insurance bad faith actions, UJI 13-1827 NMRA is unnecessary and should not be given in such cases." Similarly, the "Use Notes" for UJI 13-1827

acknowledge that there are "punitive damage instructions specifically applicable to particular causes of action which should be used where appropriate" and specifically references UJI "13-1718 (insurance bad faith)" as one such instruction.

Although the use notes in both jury instructions indicate that UJI 13-1718 is the applicable instruction in insurance bad faith claims, Defendant argues that the Committee Commentary in UJI 13-1718 provides different directions. In that section, the editors suggest a court should consider the New Mexico Supreme Court holdings in *Jessen* "[w]here an insurer has hired a third party to satisfy its contract obligations and the third party's conduct justifies an instruction on punitive damages." Because two of the claims adjustors that worked on the claim were independent contractors, Defendant argues that *Jessen* is applicable.

In *Jessen*, an insurer had hired an independent insurance adjustor to investigate an accident. The jury found that the independent adjustor had behaved in bad faith when he took more than two years to investigate the claim, put a significant burden on the insured during that investigation, and did not produce results of sufficient reliability to support the insurer's denial of the claim. Accordingly, the jury awarded punitive damages. The insurance company appealed, arguing that it could not be responsible for the behavior of an independent contractor. The New Mexico Supreme Court affirmed.

First the *Jessen* Court found that although an independent contractor had performed the investigation, a jury could have found that the insurer's decision to delay payment on the claim based on the third party's investigation was an independent act that warranted punitive damages. *Id.* at 1249. The Court also found that the "same evidence provides adequate support for a finding of ratification," because "[r]atification may be implied by acquiescence in the results of

an unauthorized act." The corporate officers' "authority to deny or honor the claim" supported the jury's finding that the company had ratified the third party's investigation. *Id.*

Defendant argues that *Jessen* is applicable here because Plaintiff's claim was first investigated by two independent contractors: ICA, Inc. and Ned Derickson. Doc. 65 at 5. According to Defendant, *Jessen* obligates Plaintiff to show that (1) one or both of the parties acted in bad faith, or (2) that Defendant "ratified, authorized, or participated in the bad faith conduct of non-managerial employees" or (3) *that* Defendant's employee "with managerial authority, John Kubant, committed an act warranting punitive damages." *Id.* Defendant argues that Plaintiff has not met its burden in demonstrating one of these prongs applies.

As an initial matter, the Court observes that committee commentary in UJI 13-1718 merely suggests, if applicable, a court "***consider Jessen***" (emphasis added). Regardless, to the extent that *Jessen* is applicable, Plaintiff has presented evidence that meets the criterion delineated there. Plaintiff's allegation that a denial was predicated on an incomplete investigation by a third party is analogous to the *Jessen* claims. Just as in *Jessen*, a jury could find that wrongful reliance by Defendant on an improper investigation by ICA or Mr. Derickson is an independent bad faith act. Plaintiff has also produced evidence that Defendant ratified the acts of its independent contractors. Testimony by Lynn Renlund, a corporate representative of Defendant, established that "all denials have to be approved by the immediate supervisor [of the claims adjustor]." *See* Doc. 58-14 at 7, 35:19-21. Therefore, a jury could conclude that a managerial representative of Defendant sanctioned the denial by ICA and Ned Derickson of the interior damage claim. Testimonial evidence shows that while some independent adjustors have the discretion to determine payment amounts on claims, that discretion is cabined within certain parameters. Notably, the initial estimate by ICA fell just under the $150,000.00 Defendant had

initially allotted for the claim. As explained by Mr. Renlund, an individual in a managerial capacity would have had to approve any amounts above those parameters. *See* Doc. 58-14, 35:19-24; see also 58-14, 34:17-22 (testimony by Mr. Renlund that all of Mr. Derickson's recommendations and decisions had to be approved by a supervisor).

Ultimately, whether Defendant committed an independent bad faith act when it accepted the findings of the third-party adjustors ICA and Mr. Derickson, or whether it ratified their actions is a fact question for a jury. More importantly, when a plaintiff has properly alleged a bad faith claim for a frivolous and unfounded failure to pay, the New Mexico Supreme Court has counseled that punitive damage claims should go to a jury. As there are several material, disputed factual issues on Plaintiff's common law bad faith and UPIA claims, the Court will deny Defendant's Punitive Damages Motion.

**IT IS ORDERED THAT:**

1.     Defendant's Motion for Partial Summary Judgment on Breach of Contract (Doc. 52) is **DENIED**;

2.     Defendant's Motion for Partial Summary Judgment on Plaintiff's Insurance Based Claims (Doc. 54) is **DENIED**; and

3.     Defendant's Motion for Partial Summary Judgment on Plaintiff's Claim for Punitive Damages (Doc. 53) is **DENIED.**

**IT IS SO ORDERED.**

**KEA W. RIGGS**
**UNITED STATES DISTRICT JUDGE**